

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION

*BRIAN SPENCER*
*Counter-Claimant*

*JOHN DOE*

*Counter-Defendant*

CIVIL ACTION NO.1:23-cv-00002
Counter Claim

## DEFENDANTS COUNTERCLAIM AGAINST THE PLAINTIFF FOR PAIN AND SUFFERING BROUGHT ON BY THE FRIVOLOUS LAWSUIT LOBBIED AGAINST HIM.

COMES NOW the Defendant, from Civil Action 1:23cv-00002 BRIAN SPENCER to be known in this filing as Counter-Claimant for his counterclaim against Plaintiff John Doe to be known in this filing as Counter Defendant. The counterclaim will show that Counter Defendant and his attorney Matthew Wilson acted in unison in filing this frivolous lawsuit as there was a lack of legal precedent, lack of merit, unverified and unproven facts that were instrumental in support of the Civil Suit.

1.

The Counter-Defendant knowingly and willingly mislead, deceived and manipulated the court with false information and inaccurate accounts of events within his own order of events and willfully filed for a Protection order also under false pretenses all these actions have left the Counter-Claimant in extremely deteriorated financial, physical and mental state. As will be proven with the supporting documentation that Counter-Claimant suffered a massive 4cm Intracerebral Hemorrhage brought on by the excessive amount of stress, lack of

1

sleep and humiliation of the claim filed against him and the heavy burden brought on by defending himself against supposed truths since proven to be lies.

The excessive hours put in researching and preparing a defense in Federal Court on top of the enormous marital and family stress this has caused. The Injunction being served was embarrassing and caused extreme fear of termination at the Counter-Claimant's place of employment as he works for a company that works directly in Federally restricted areas and having a Federal Injunction very well could have caused his unjustified termination. Counter-Claimant is now forever tagged with a Federal record showing a protection order that is to this day still active and could cause termination at any point in these proceedings. Counter Claimant was denied medical counselling due to the redactions and the imposed injunction preventing any discussion with a professional as it cannot take place without violating the aforementioned injunction. As such the constant turmoil and inability to have any means of therapeutic reprive played a significant role in the demise of Counter-Claimant's massive 4cm Intracerebral Hemorrhage. The Counter-Claimant's cognitive functions, physical functionality and mental state have all been adversely and profoundly negatively affected. The overall damage brought by the Intracerebral Hemorrhage remains to be seen however the general studies indicate high likely probability of another Intracerebral hemorrhage within months to years with a lowered likelihood of regaining the normal functions that have deteriorated as a result of this entire situation. The significant and major fear is the average lifespan of 9-1/2 years (as indicated in numerous medical research studies see provided Docs Labeled Stroke Rate) given the Counter-Claimant is currently 49 years old.

2

2.

The Following will show the chronological order of events leading to Counter-Defendant's reason to bring the countersuit.

1. The Counter Defendant by his own timeline of events proves he acted without regard for proper legal etiquette as established by the rules and regulations referenced in the FEDERAL RULES OF CIVIL Procedure and TENNESSSE'S local rules governing the filing of a Civil Suit.

The following is the actual account of events as stated by the Plaintiff and his attorney and submitted under penalties of perjury.

Actual Filings in prior motions below and Plaintiff/Defendant used for consistency:

- **10/12/2022** Defendant became aware of an extra marital affair between the Plaintiff and the Defendant's wife which took place on the social media platform Facebook also the online game known as Words with Friends.
  - **10/12/2022** Defendant communicated with the Plaintiff's wife regarding affair
  - **10/27/2022** Email between the Defendant and the Plaintiff.
  - **12/1/2022-12/2/2022** Cards post marked from Massachusetts to Tennessee.
  - **12/6/2022** Plaintiff's wife contacted the Defendant via email stating the card in question had been received.
  - **12/9/2022** Defendant replied to Plaintiff's wife's email.
  - **12/16/2022** Defendant contacted the Plaintiff regarding the wife's email.
  - **12/19/2022** Defendant receives a Cease and Desist request in which Attorney Wilson repeatedly divulges the Plaintiff's first and last name additionally states *"Any subsequent communication directed towards (J. Doe) - or to any person associated with him – will be met with the full force of Federal and/or State Law."* (Attachment A)

3

- **01/04/2023 9:55 A.M.** Defendant's Facebook Messenger account was hacked sending out a the TiK ToK message of "Look Who Died".
- **01/04/2023 10:36 A.M.** Attorney Wilson contacts Defendant's wife S.S. leaving a message (in which he identifies his client's first and last name) that he is trying to reach the Defendant. (Attachment B)
- **01/04/2023 11:45 A.M.** Defendant calls Attorney Wilson twice both times reaching voice mail
- **01/04/2023 11:56 A.M.** Attorney Wilson emails Defendant alluding to a court proceeding and taunting the Defendant "*I look forward to seeing you in court in Tennessee later this year*". (Attachment C)

The Plaintiff in this case failed to perform the due dillagance to meet the burden of proof necessary for the "VERIFIED" complaint of a death threat.

- Paragraph 25 in the "VERIFIED" complaint submitted by the Plaintiff states "Brian sent a Face Book message to the Plaintiff on January 4th 2023 threatening his life"
- This death threat as is attested to and signed under the pains and penalties of perjury by the plaintiff was in-fact not a threat it was "Look who died, in an accident I think you know him so sorry" with a link to a TiKToK video. In representing this to the court as to be true to the best of the Plaintiff's knowledge and "VERIFIED" shows that there was no attempt or due diligence to verify the legitimacy of this threat. This negligent intentional statement entered as fact is Fraud on it's own and is a crime.

- This complaint was filed within days of the fraudulent accusation and in Pages 13-14 of the "VERIFIED" complaint the Plaintiff suffered extensively only after this by his definition a "death threat" proven in the Plaintiff's own timeline on pages throughout the "VERIFIED" complaint. What the Plaintiff shows is the entire claim was predicated upon this un- VERIFIED death

4

threat. Where as the Un-Verified cards mailed in early December resulted in only a cease and desist request via attorney Wilson. To claim the cards triggered the civil suit contradicts the Plaintiffs actions, as is clearly shown in the timeline, as the civil suit was filed only after the supposed death threat since proven to be in fact UN-VERIFIED.

- The Plaintiff willfully and knowingly submitted a Facebook message that in it's own words contained no direct threat of death, merely a mention of a car accident involving the death of someone you MAY have known. There is no reference, threat or mention of personal death. This false statement became material in the filing of the Civil Action and in the acquisition of the restraining order and subsequent injunction. This false statement of a death threat directly influenced the decision of the court to allow for the restraining order and the Civil Action as it is the reason for filing the Civil Action. The Plaintiff asserts that he "knew that Defendant hated him with a passion; thus had a good reason to be concerned..." (Plaintiff Response p 4). This statement is made as FACT and yet no evidence of hatred is presented. How does the Plaintiff factually know and present as fact this hatred when no such statement was made and hatred is a feeling with no supporting facts or proof provided to the court. Plaintiff may speculate he is hated but to say he knew and then decide it is fact and then cite fear in the court filings order to gain financially is a manipulation of law. The Plaintiff further stated that "he had no way of knowing that the Defendant's account had also sent this message to dozens of other people" (Plaintiff Response p. 4). What is most striking in this message having been sent out to the multitude of other people is that only one person decided it was a direct threat. Applying the legal standard of Reasonable Person it is clear that a majority of the other people ignored it and several responded that it was a scam and that Defendant's account may have been hacked. Only one person decided to claim fear and

5

distress and file a Civil Action. Only one person was so distressed that after 45 minutes had his attorney contact the Defendant's wife. Only one person filed a Civil Action and was granted a TRO 5 days later. Only one person decided to twist an innocuous spam message and use it an attempt to make a significant sum of money. Only one person perjured himself for financial gain. The Plaintiff has not admitted to any wrong doing to this point even after several attempts by Attorney Wilson to garner such admission and in fact the only admitted guilt was in fact Attorney Wilson stating "Ok it wasn't a death threat if it pleases the court we can resubmit".

- The Counter-Defendant accompanied by his attorney maliciously, fraudulently obtained in secret a Protection Order against Counter-Claimant. The attorney filed and was granted a hearing without Counter-Claimant afforded the right to due process and thereby violating his 5th and 14th amendment rights  It states that no person shall be "deprived of life, liberty, or property without due process of law".  The attorney claimed this was necessary for given reason of the Counter-Claimant's presumed retaliatory actions. Conversely, Attorney Wilson in fact had given Counter-Claimant ample notification of upcoming litigation intentions and still found it necessary to deceive the court with Blatant misinformation and facts regarding Counter-claimant's knowledge of the intentions and did so via email, voicemail and interstate mailings prior to applying for and receiving the TRO/Injunction. Attorney Wilson directed the court to deny the Counter-Claimant the aforementioned right to due process when he knowingly and blatatently lied to the Court about the need for secrecy while simultaneously taunting the Counter-Claimant.

Counter-Claimant has endured numerous death threats VIA phone calls which began 2 days after the Airing of a news report in regards to this case on the Local news WKRN in Tennessee. The Counter-Defendant's attorney made the

6

statement that "Anyone with a PACER account can obtain this information" The airing of this contained evidence from the case in which the Counter-Defendants Name was not included in yet the Pacer information requirements appear to be a name (which is John Doe) or docket#. The only person with the evidence that was highlighted on the news broadcast was the court and the Counter-Defendant/Attorney. The Counter-Claimant has not been found guilty, partly responsible, submitted an answer to the civil suit, entered into any plea agreement or even negotiated showing guilt in anyway and because of this botched filing (see entire timeline of events Page 6) the Counter Claimant has suffered extensive mental anguish.

3.

The Counter-Defendant via his attorney repeatedly twisted and attempted to manipulate the court with inaccurate statements, dismissive attitude when attempting to minimize the court's ruling <Document 25 filed 2/2/23> that the death threat was in fact spam and his statement of resubmitting without the death threat if he had to.     This Court did in fact agree that there was no death threat and it was spam. Attorney Wilson's response to this was <Memorandum of law in response to Defendant's Motions to dismiss> "casual indifference' and said he would resubmit if the court wanted him too which in itself is egregious. For the Counter-Defendant through his Attorney so easily be willing to just drop the catalyst of his lawsuit (as per his own timeline) would be allowing him to resubmit without prejudice circumventing the pending decision on the Counter-Claimants Motion to dismiss. Along with being a focal point it is also considered by Tennessee law as a criminal act if the Counter-Defendant was in fact in fear for his life simply negating this

7

demonstrates there never was a fear yet a major lawsuit was filed based on this.

Counter-Defendant along with his attorney purposely manipulated the Court and caused an unimaginable amount of stress leading to his Intracerebral Hemorrhage along with immense marital, financial and employment concerns. The Counter Defendant and his attorney are directly responsible for and this callous indifference and negligence need to be remedied with relief granted from this court.

The Counter-Claimant seeks relief in the amount of 3,000,000.00 this is based on the magnitude of the injury sustained due to excessive stress brought on by the Counter-Defendant plus reasonable attorney fees and reasonable interest. The amounts have been considered with the extent of the Counter-Claimant's injury in mind and the diminished life expectancy before him. To that end this countersuit is being submitted now out of an abundance of caution as the Counter-Claimant cannot verify his future ability to file it is requested the court accept and rule in Counter-Claimants favor.

Prepared by:
Brian Spencer
47 Dean Pl.
East Bridgewater MA. 02333

8

# Life Expectancy after Stroke Based On Age, Sex, and Rankin Grade of Disability: A Synthesis

Robert M. Shavelle, PhD, FAACPDM,* Jordan C. Brooks, PhD, MPH,*
David J. Strauss, PhD, FASA,* and Lynne Turner-Stokes, DM, FRCP, MBE†

*Background:* Stroke is a leading cause of death and disability in the developed world. The major factor affecting long term survival (other than age) is known to be the severity of disability. Yet to our knowledge there are no studies reporting life expectancies stratified by both age and severity. Remaining life expectancy is a key measure of health. *Methods:* We identified 11 long-term follow-up studies of stroke patients that reported the multivariate effects of age, sex, the modified Rankin Scale (mRS) grade of disability, and other factors. From these we computed the composite effects of these factors on survival, then used these to calculate age-, sex-, and mRS-specific mortality rates. Finally we used the rates to construct life tables, and hence obtain life expectancies. *Results:* Life expectancy varies by age, sex, and mRS. The life expectancies of males age 70, for example, were 13, 13, 11, 8, 6, and 5 years for Rankin Grades 0-5, respectively, representing reductions of 1, 1, 3, 6, 8, and 9 years from the corresponding general population figure. *Conclusions:* These figures demonstrate the importance of rehabilitation following stroke, and can be used in discussion of public policy and benchmarking of future results.
**Key Words:** Survival—severity—ischemic—hemorrhagic—life table—epidemiology—cerebrovascular disease—intracranial hemorrhage
© 2019 Elsevier Inc. All rights reserved.

Stroke is the leading cause of disability and the fourth leading cause of mortality in the United States.[1] The consequences of a stroke can vary considerably. In the mildest cases there is no residual impairment; in the most severe, the patient may be bedbound and fully dependent for all activities of daily living. Much has been written about prognosis after stroke, including many studies on short-term survival, recurrence, and recovery. There is very little, however, regarding life expectancy (i.e., the mean long-term survival time). This gap in the knowledge base is surprising given the high prevalence of stroke and the large costs associated with long-term care.[2]

From the *Life Expectancy Project, San Francisco, California; and †Department of Palliative Care, Policy and Rehabilitation, Cicely Saunders Institute, Northwick Park Hospital, Harrow, Middlesex, UK.
Received June 30, 2019; revision received September 16, 2019; accepted September 25, 2019.
Financial Disclosure: None
Address correspondence to Robert M. Shavelle, PhD, FAACPDM, Life Expectancy Project, 1439 – 17th Avenue, San Francisco, CA 94122-3402. E-mail: Shavelle@LifeExpectancy.org.
1052-3057/$ - see front matter
© 2019 Elsevier Inc. All rights reserved.
https://doi.org/10.1016/j.jstrokecerebrovasdis.2019.104450

Life expectancy is a useful summary measure of health, and is commonly reported by national statistical agencies for entire populations. It is computed using standard scientific methods. These same methods have been used across a wide range of medical conditions. Some recent examples include cancer,[3] diabetes,[4] heart failure,[5] chronic kidney disease,[6] HIV,[7] and spinal cord injury.[8] Such studies typically include a comparison with the general population life expectancy, thereby providing an indication of the burden of disease. By contrast, most of the published studies of stroke survival have reported only survival probabilities or hazard ratios, which can be more difficult to interpret.

Recovery of function after stroke is an important outcome measure[9] and is a key component of health.[10] Indeed, functional ability has long been recognized as a key prognostic factor for survival at older ages,[11-15] and in persons with disabilities due to either congenital or acquired brain injury.[16,17] It is a matter of observation that the severity of disability following stroke is one of the most important factors related to long-term survival: the reported relative risks of mortality for various measures of functional ability are nearly always much larger than those of other risk factors such as age, sex, or hypertension. Slot et al.[18] concluded that "Functional status of patients 6 months after onset of an ischemic stroke has

Case 1:23-cv-00002    Document 39    Filed 07/06/23    Page 9 of 22 PageID #: 259

a significant and substantial effect on their long term survival." Similarly, Kammersgaard[19] wrote: "The 2 most prominent factors that determine both short- and long-term survival after stroke are age and stroke severity at onset."

In practical work there is often a need for evidence-based guidance for counseling, financial planning, and medical decision making for individual patients. The most useful studies for this purpose stratify results according to patient sex, age, and relevant indicators of the severity of the condition.

Numerous stroke studies have reported short-term survival probabilities based on either age or severity, but apparently not both simultaneously. One study provided life expectancies based on age, sex, and type of stroke.[20] Yet to our knowledge there have been no studies reporting life expectancies stratified by the 2 most important factors: age and severity of disability. In this article we report life expectancies stratified by age, sex, and severity, as measured by the modified Rankin Scale (mRS).[21] This is not based on any original analysis of patient data; instead we have synthesized results from the existing medical literature.

## Methods

Based on computerized searches of the medical literature (PubMed.gov and Google), and successive examination of the reference citations given in the identified studies, we identified all stroke studies meeting the following four criteria:

1. The follow-up was for at least 1 year post stroke;
2. Severity of disability was evaluated using the mRS; and
3. Mortality occurring in the first few months after stroke was excluded;
4. Survival analyses were performed using a multivariate model that controlled for age, sex, mRS, and at least some possible comorbid factors.

Strokes of all types, subtypes, and etiologies were included (for rationale, see the Supplement, sections H and I). The multivariate survival models in the identified studies yielded relative risks (RRs) of mortality for each of the considered variables (also called covariates or risk factors). For example, an RR of 1.3 for diabetes indicates that persons with diabetes have, on average, 30% higher mortality than those who do not, after controlling for the other factors in the model.

The first of the 4 conditions reflected our interest in long-term survival, and the second our focus on long-term severity of disability. We imposed the third to exclude the effects of acute mortality risk, and to measure survival only after the patient had stabilized; several studies have shown that improvement plateaus at 3 months,[22,23] and thus disability was mainly assessed at 3 to 6 months post stroke. The final criterion was necessary because mRS is highly correlated with older age, male sex, and an adverse past medical

history. We did not require that the study be of patients who had suffered their first ever stroke, though all but 2 studies met this requirement. We return to all 4 of these selection issues and related items in both the Discussion and Supplement.

In what follows we use the notation mRSi (where i = 0-5) to refer to a patient at grade i (i = 0-5) of the mRS, and RRi to refer to the relative risk of mortality (compared with some baseline group) for persons in that mRS group. From the 11 identified studies we computed summary RRs for mRS0-5. Briefly, these RRs are a synthesis of the RRs given in the 11 studies (essentially a weighted average of the stated RRs); we did not perform complex statistical modeling or estimation, per se.

We used the above RRs to calculate age- and sex-specific mortality rates for each of the 6 grades of the mRS. We then used the resulting mortality rates to construct life tables[24] for males and females for each of mRS05, from which we obtained life expectancies and survival curves. Technical details and a glossary are provided in the Supplement.

The stroke life expectancies were compared with those of the current U.S. general population[25] (GP; i.e., "the normal figures") and also with those of persons in the PVS (permanent vegetative state; i.e., the most severe neurological disability class).[26] These comparisons provide reasonable upper and lower bounds on life expectancy for persons with a history of stroke.

## Results

Table 1 lists the 11 studies we identified. Boxes around more than 1 cell in the table indicate that the study combined those particular grades of the mRS. Only studies nos. 1-3 provided complete information on the effects of mRS1-mRS5 compared with mRS0. The weighted average RRs (weighted by the number of deaths in the studies) across only these 3 rows can be shown to be 1, 1.11, 1.62, 2.10, 2.95, and 4.95. For example, for mRS2 we find RR2 = (308*1.74 +100*1.54+470*1.55)/(308+100+470) = 1.62.

The other 8 studies were used to increase the precision of the above estimates. As noted, technical details on all the computations are given in the Supplement. The resulting summary figures for mRS0-5 are shown in the last row of the Table: 1, 1.11, 1.64, 2.04, 3.03, and 4.66. These are evidently quite similar to the six figures noted above; that is, the composite RRs are robust to the inclusion of the 8 additional studies. Also, as can be demonstrated, removal of any one study (sensitivity analysis) does not significantly change the RRs or resulting life expectancies.

Table 2 shows life expectancies by age, sex, and mRS, with values for the GP and PVS provided for comparison. For example, at age 70, which is roughly the mean age in the studies considered here, the life expectancies in years for males are: 14 (reference GP), 13, 13, 11, 8, 6, 5 (mRS0-5), and 3 (reference PVS).

**Table 1.** *Principal studies relied upon and the summary relative risks (RRs) by modified Rankin Scale grade. The key findings are in the last row of the table*

| # | Author - year | Study years | Country | n | Deaths | PercentMale | Age ± SD | Av FU | Av FU Age | RRs by modified Rankin Scale (mRS) | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | 0 | 1 | 2 | 3 | 4 | 5 |
| 1 | Slot et al.[18] LSR | 1990-2003 | UK | 2054 | 308 | 53 | 68 ± 13 | 4 | 70 | 1 | 0.98 | 1.74 | 2.58 | 3.89 | 4.98 |
| 2 | Slot et al.[18] OCSP | 1981-1991 | UK | 539 | 100 | 50 | 73 ± 12 | 5 | 76 | 1 | 1.20 | 1.54 | 2.04 | 1.82 | 1.25 |
| 3 | Huybrechts et al.[38] | 1992-2004 | Greece | 1816 | 470 | 62 | 70 ± 12 | 3 | 72 | 1 | 1.18 | 1.55 | 1.80 | 2.57 | 5.72 |
| 4 | Suto et al.[39] | 1999-2002 | Japan | 692 | 83 | 58 | 72 ± 12 | 2 | 73 | 1 | | | 0.89 | 2.27 | 3.12 |
| 5 | Eriksson et al.[22] | 2001-2006 | Sweden | 15,959 | 4000 | 52 | 73 ± 9 | 3 | 74 | 1 | | 1 | 1.739 | 2.531 | 3.809 |
| 6 | Magalhaes et al.[23] | 1998-2007 | Portugal | 313 | 157 | 45 | 72 ± 8 | 6 | 75 | 1 | | | 2.39 | | 4.47 |
| 7 | Chiu et al.[40] | 2006-2009 | Taiwan | 1,032 | 116 | 59 | 68 ± 12 | 1 | 68 | 1 | | | | | 4.69 |
| 8 | Kimura et al.[29] | 1999-2000 | Japan | 10,981 | 604 | 60 | 70 ± 11 | 1 | 70 | 1 | | 1 | | 2.57 | |
| 9 | Slot et al.[18] IST | 1991-1998 | UK | 5117 | 1354 | 52 | 73 ± 11 | 4 | 75 | 1 | | 1 | | 1.63 | |
| 10 | Petty et al.[32] | 1985-1993 | USA | 442 | 245 | 41 | 76 ± 12 | 7 | 78 | 1 | | | 1.27 | | 3.47 |
| 11 | Melkas et al.[41] | 2003-2008 | Korea | 486 | 347 | 51 | 71 ± 8 | 8 | 75 | 1 | | | 2.04 | 2.02 | 4.66 |
| | Summary RRs | | | | | | | | | 1 | 1.11 | 1.64 | 2.04 | 3.03 | 4.66 |

Abbreviations: Av FU, average follow-up time in years; Av FU Age, average age plus half of Av FU; IST, International Stroke Trial (UK patients only); LSR, Lothian stroke register; OCSP, Oxfordshire community stroke Project; SD, standard deviation.

As can be seen, the life expectancy of stroke patients is similar to that of the GP for persons with mRS0, and decreases as severity increases. It is also clear that (1) age is a significant factor, and (2) sex affects survival more amongst the less severely disabled (mRS0-2) than amongst the more severely disabled (mRS3-5).

## Discussion

Most survival curves given in the published literature are not stratified by either age or sex; thus the effects of mRS are necessarily confounded with these factors. The present results, however, explicitly control for age and sex. Some caution is therefore necessary when making comparisons with prior results. Nevertheless, the survival results given here are consistent with those of prior studies. For example, Figures 1 and 2 show that the 5-year survival probabilities for males/females age 70 with mRS 0-5 are respectively 78%/85%, 70%/78%, 64%/71%, 53%/59%, 42%/46%, and 30%/30%. For patients in the Lothian Stroke Registry, with average age 68 ± 13 and 53% male, Figure 2 of Slot et al.,[18] gives corresponding probabilities (males and females combined) of 82%, 75%, 67%, 43%, 36%, and 31%. As is evident, the figures from Slot et al.[18] are intermediate to those given here for mRS0-2 and very similar for mRS5, though modestly lower for mRS3 and mRS4. Of

**Table 2.** *Life expectancy (years) by age, sex, and grade on the modified Rankin Scale*

| Age* | Modified Rankin Scale Grade | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Male | GP | 0 | 1 | 2 | 3 | 4 | 5 | PVS |
| 50 | 30 | 28 | 27 | 22 | 17 | 13 | 9 | 7 |
| 60 | 22 | 20 | 19 | 16 | 13 | 9 | 7 | 5 |
| 70 | 14 | 13 | 13 | 11 | 8 | 6 | 5 | 3 |
| 80 | 8 | 7 | 7 | 6 | 5 | 4 | 3 | 2 |
| Female | | | | | | | | |
| 50 | 33 | 32 | 30 | 25 | 19 | 14 | 9 | 7 |
| 60 | 25 | 24 | 22 | 18 | 14 | 10 | 7 | 6 |
| 70 | 17 | 16 | 15 | 12 | 9 | 7 | 5 | 4 |
| 80 | 10 | 9 | 9 | 7 | 6 | 4 | 3 | 3 |

Abbreviations: GP, General population life expectancies.[25] PVS = Persistent vegetative state; values taken or derived from Shavelle et al.[26]

Grade Description:

0: No symptoms or disabilities due to stroke.

1: No significant disability following stroke, despite symptoms: Able to carry out all usual duties and activities.

2: Slight disability: Unable to carry out all previous activities but able to look after own affairs without assistance.

3: Moderate disability: Requiring some help with daily activities, but is able to walk without assistance.

4: Moderately severe disability: Unable to walk without assistance, and unable to attend to own bodily needs.

5: Severe disability: Bedridden, incontinent, and requires constant nursing care and attention.

*Age = Age at follow-up, rather than at stroke onset.



**Figure 1.** *Survival curves by Rankin Grade for 70 year-old males. The top (green) curve is the general population. The other curves, in order from top to bottom, are for mRS0-5. (Color version of figure is available online.)*



**Figure 2.** *Survival curves by Rankin Grade for 70 year-old females. The top (green) curve is the general population. The other curves, in order from top to bottom, are for mRS0-5. (Color version of figure is available online.)*

note is that the survival curve for mRS3 in Slot et al. drops sharply between years 6 and 7, due to small sample size. At year 6, though, their survival is 54%, compared with 59% here for males and 64% for females.

That there are significant differences in life expectancies between the grades demonstrates the importance of rehabilitation. Appropriate and timely interventions can lead to improvement in functional status, which increases both quality and quantity of life. Conversely, patients who do not receive such care may not recover to the maximum extent possible; as a result, their life expectancy may be lower than it would have been under more ideal circumstances.

A related issue is that of functional deterioration. For example, a patient now at mRS4 who was previously at mRS2 may have a different prognosis from one in mRS4

continuously since the time of stroke. We are not, however, aware of any empirical evidence on this topic. In addition, it may be worthwhile to determine whether rehabilitation efforts were insufficient; for example, a patient narrowly at mRS grade 3 (rather than grade 4) only due to intensive rehabilitation may have a worse prognosis than one in the same grade who did not recover as well as they otherwise would have under more ideal circumstances.

The survival figures derived here may be useful in public policy discussions, given that stroke is a leading cause of death in the developed world, the leading cause of disability, and a significant financial commitment on public medical funds. Indeed, the cost to society would be significantly lessened if rehabilitation were more effective.[12]

Further, the results given here can be practically used by epidemiologists and medical researchers for benchmarking. Specifically, the empirical survival results in any (future) study may be evaluated in light of those given here. This could take the simple form of comparing the observed and expected survival curves,[13] or instead by comparing the observed and expected number of deaths,[44] in both cases after controlling for important patient differences in age, sex, and severity of disability. One could then determine if survival in the new study group was better, worse, or similar to these baseline values.

*Study Limitations*

As noted, the synthesis here is based on patients who survived at least 3 months post stroke. This research is therefore not relevant to medical decision-making during the acute period. It may, however, prove helpful in situations where the patient's remaining life expectancy is a factor in treatment decisions regarding other medical conditions, as has been the case in cancer screening[45,46] and choice of valve replacement type.[47]

The results given here are predicated on the assumption that the patient has become largely stable. While studies do indicate improvement in both motor and cognitive disability late after stroke, provided that patients continue to receive appropriate rehabilitation intervention,[27] Magelhaes et al.,[23] showed that very few improve in mRS after 3 months. We are not aware of any evidence to suggest that significant motor or mRS improvement frequently occurs after, say, 6 months following stroke, but to the extent it is possible the results given here may be optimistic. Further, we made no allowance for the time since onset of stroke. That is, all else being equal (same age, sex, and mRS), the life expectances are presumed to be the same for persons who are 1 year post stroke, for example, or 10 years post stroke. We are aware of only one study that addressed this issue. This is Slot et al.,[18] who reported that survival did not vary between the 414 persons observed 1 year post stroke and the remaining 2054 who were followed from 6 months post, and also that use of the mRS at 1-month post stroke gave results similar to that at 6-months post.

A further assumption is that there have not been major improvements in stroke survival relative to the general population in recent years. Slot et al.[18] wrote: "Our analyses of survival during different time periods showed, as one might expect, that survival did indeed slightly improve over time." On the other hand, Poon et al.,[28] in a review article published in 2013, reported "These [stroke] long-term survival rates do not appear to have changed over time." Similarly, such secular trends have not been found for adults disabled due to traumatic brain injury.[17]

As noted in Methods, we did not restrict attention to patients who had suffered a first ever stroke, though most of the studies met this requirement (the 2 exceptions are Kimura et al.[29] and VanWijk et al.[30]). Melkas et al.[31] reported that prior stroke was not a significant factor for subsequent survival, while Petty et al.[32] and Carter et al.[33] suggested that there is higher mortality for those who had a prior stroke. Kimura reported that the effect of prior stroke was a relative risk of 1.28. Prior stroke is correlated with both older age and greater severity of stroke, and thus this relative risk may in fact be confounded with those factors. Further, Kimura used only a simple measure of severity (mRS3-5 versus 0-2), which is an additional reason to remain cautious. Nevertheless, if the existence of a prior stroke is indeed a significant independent risk factor then the figures given here may be slightly too high if applied to persons who have had more than one stroke and too low for those who have not.

It is not surprising that persons with Rankin Grade 0 or 1 have a modest reduction in life expectancy — the underlying reasons for the stroke may still apply (e.g., smoking). Similarly, is it not surprising that persons with Rankin 5 have very low life expectancies, similar to those in the PVS, as both groups are bed bound, very severely disabled, and unlikely to improve in function.

The results given here are applicable to a given person who is of the stated age and sex, and whose clinical condition is "typical" of the stated Rankin grade. For persons whose disabilities appear intermediate to 2 grades it may be appropriate to interpolate between the stated life expectancies. The person's clinical profile of comorbid factors should be fairly typical of the mRS group, as can be determined by examination of the population characteristics delineated in the many studies listed here. If an individual has an unusual and significant comorbidity, or an etiology predisposing to increased risk of recurrence, an adjustment can be made using standard methods, as discussed in the Supplement. Note that the list of possible comorbid factors is extensive (e.g., heart disease, cancer, and any other medical condition), whilst there is at best limited evidence on the marginal effect of any one of these (i.e., after age, sex, and the severity of stroke have been taken into consideration).

The mRS is a widely used measure of global disability following stroke.[34] It has found use as a predictor of future stroke, functional recovery, and mortality. The scale is highly correlated with mobility and ADLs, but less so with cognitive and social functioning.[35] While it is known to be less sensitive to small changes in function than, for example, the Barthel Index and Functional Independence Measure (FIM),[36] it can be quickly applied[35] and has excellent reliability.[37] The limitations most relevant to the present work, are (1) the comparatively few steps on the scale, and (2) the rather wide gap in functional ability between levels 3 and 4. (Specifically, it is not clear how to grade someone who cannot walk without assistance but who can nevertheless care for their own bodily needs.) Future long-term survival studies of stroke patients might therefore usefully be based instead on the FIM.

## Conclusions

In any synthesis such as the present work, various studies are compiled and weighted in some fashion in order to obtain composite summary results. The composite relative risks derived here were from patients followed from as early as 1981 to as late as 2009; in countries including Sweden, the United States, and Japan; with some models accounting for the possible effects of stroke subtype and hypertension, for example, and others that did not. Yet the resulting RRs from these studies indicate a robust similarity. While a single RR from a single study may be higher or lower than the average, perhaps due to a small sample size or under- or over-specified survival model, the composite figure nonetheless represents our best summary of the extant empirical evidence. The life expectancies derived here therefore indicate the current state of knowledge regarding long-term survival after stroke. Notably, life expectancy is strongly related to age, sex, and the severity of disability, as measured, for example, by the modified Rankin Scale. The results given here may thus be useful in public policy discussions, to establish the cost-effectiveness of rehabilitation, and for benchmarking of future studies.

**Acknowledgments:** The authors thank Dr. Ross Mackenzie for various discussions and advice over the past 15 years, and also their outstanding research assistants: David Paculdo, Kate Vavra-Musser, and Jessica Lee.

Statement of Ethics: The authors have no ethical conflicts to disclose.

Conflict of Interest: None.

Author Contributions: Drs. Shavelle, Strauss, and Brooks performed the research and analyses. All authors contributed to the writing.

## Supplementary materials

Supplementary material associated with this article can be found in the online version at doi:10.1016/j.jstrokecerebrovasdis.2019.104450.

## References

1. Benjamin EJ, Blaha MJ, Chiuve SE, et al. and On behalf of the American Heart Association Statistics Committee and Stroke Statistics Subcommittee of. (2017). Heart disease and stroke statistics—2017 Update: A report from the American Heart Association. Circulation. 2017; CIR.0000000000000485, originally published January 25, 2017. https://doi.org/10.1161/CIR.0000000000000485.
2. Taylor TN, Davis PH, Torner JC, et al. Lifetime cost of stroke in the United States. Stroke 1996;27:1459-1466.
3. Shavelle RM, Vavra-Musser K, Lee J, et al. Life expectancy in pleural and peritoneal mesothelioma. Lung Cancer Int 2017;2017:8. Article ID 2782590. https://doi.org/10.1155/2017/2782590.
4. Walker J, Colhoun H, Livingstone S, et al. Type 2 diabetes, socioeconomic status and life expectancy in Scotland (2012-2014): a population-based observational study. Diabetologia 2017;61:108-116.

5. Alter DA, Ko DT, Tu JV, et al. The average lifespan of patients discharged from hospital with heart failure. J Gen Intern Med 2012;27:1171-1179.
6. Turin TC, Ahmed SF, Tonelli M, et al. Kidney function, albuminuria and life expectancy. Can J Kidney Health Dis 2014;1:33.
7. Marcus JL, Chao CR, Leyden WA, et al. Narrowing the gap in life expectancy between HIV-infected and HIV-uninfected individuals with access to care. J Acquired Immune Defic Syndr 2016;73:39-46.
8. Savic G, DeVivo MJ, Frankel HL, et al. Long-term survival after traumatic spinal cord injury: a 70-year British study. Spinal Cord 2017;55:651-658. https://doi.org/10.1038/sc.2017.23. ePub ahead of print.
9. Rabadi MH, Aston CE. Effect of transcranial direct current stimulation on severely affected arm-hand motor function in patients after an acute ischemic stroke: a pilot randomized control trial. Am J Phys Med Rehabil 2017;96 (10 Suppl 1):S178-S184. https://doi.org/10.1097/PHM.0000000000000823. 2017 Oct.
10. Stucki G, Bickenbach J, Melvin J. Strengthening rehabilitation in health systems worldwide by integrating information on functioning in national health information systems. Am J Phys Med Rehabil 2017;96:677-681.
11. Lee SJ, Lindquist K, Segal MR, et al. Development and validation of a prognostic index for 4-year mortality in older adults. JAMA 2006;295:801-808.
12. Cruz M, Covinsky K, Widera EW, et al. Predicting 10-year mortality for older adults [research letter]. JAMA 2013;309:874-876.
13. Schonberg MA, Davis RB, McCarthy EP, et al. Index to predict 5-year mortality of community-dwelling adults aged 65 and older using data from the National Health Interview Survey. J Gen Intern Med 2009;24:1115-1122.
14. Flacker JM, Kiely DK. Mortality-related factors and 1-year survival in nursing home residents. J Am Geriatr Soc 2003;51:213-221.
15. Jamrozik K, Broadhurst R, Forbes S, et al. Predictors of death and vascular events in the elderly: the Perth community stroke study. Stroke 2000;31:863-868.
16. Brooks JC, Strauss DJ, Shavelle RM, et al. Recent trends in cerebral palsy survival. Part II: Individual survival prognosis. Dev Med Child Neurol 2014;56:1065-1071.
17. Brooks JC, Shavelle RM, Strauss DJ, et al. Long-term survival after traumatic brain injury. Part II: life expectancy. Arch Phys Med Rehabil 2015;96:1000-1005.
18. Slot KB, Berge E, Dorman P, et al. Impact of functional status at six months on long term survival in patients with ischaemic stroke: prospective cohort studies. BMJ 2008;336:376-379.
19. Kammersgaard LP. Survival after stroke. Risk factors and determinants in the Copenhagen stroke study. Dan Med Bull 2010;57:B4189.
20. Hannerz H, Nielsen ML. Life expectancies among survivors of acute cerebrovascular disease. Stroke 2001;32:1739-1744.
21. Bonita R, Beaglehole R. Recovery of motor function after stroke. Stroke 1988;19:1497-1500.
22. Eriksson M, Norrving B, Terént A, et al. Functional outcome 3 months after stroke predicts long-term survival. Cerebrovasc Dis 2008;25:423-429.
23. Magalhaes R, Abreu P, Correia M, et al. Functional status three months after the first ischemic stroke is associated with long-term outcome: data from a community-based cohort. Cerebrovasc Dis 2014;38:46-54.
24. Kahn HA, Sempos CT. Statistical methods in epidemiology. Oxford: Oxford University Press; 1989.

25. Arias E, Heron M, Xu J. United States life tables, 66. Hyattsville, MD: National Center for Health Statistics; 2017.

26. Shavelle RM, Strauss DJ, Day SM, et al. Life expectancy. In: Zasler ND, Katz DI, Zafonte RD, eds. Brain injury medicine: principles and practice, New York: Demos Medical Publishing; 2007.

27. Ferrarello F, Baccini M, Rinaldi LA, et al. Efficacy of physiotherapy interventions late after stroke: a meta-analysis. J Neurol Neurosurg Psychiatry 2011;82:136-143.

28. Poon MTC, Fonville AF, Salman RA. Long-term prognosis after intracerebral haemorrhage: systematic review and meta-analysis. J Neurol Neurosurg Psychiatry 2013;85:660-667.

29. Kimura K, Minematxu K, Kazui S, et al., for the Japan Multicenter Stroke Investigators' Collaboration (J-MUSIC) (2005). Mortality and cause of death after hospital discharge in 10,981 patients with ischemic stroke and transient ischemic attack. Cerebrovasc Dis, 19:171-178.

30. van Wijk I, Kappelle LJ, van Gijn J, et al. LiLAC study group (2005). Long-term survival and vascular event risk after transient ischaemic attack or minor ischaemic stroke: a cohort study. Lancet, 365:2098-2104.

31. Melkas S, Oksala NK, Jokinen H, et al. Poststroke dementia predicts poor survival in long-term follow-up: influence of prestroke cognitive decline and previous stroke. J Neurol Neurosurg Psychiatry 2009;80:865-870.

32. Petty G, Brown Jr. R, Whisnant J, et al. Ischemic stroke subtypes: a population-based study of functional outcome, survival, and recurrence. Stroke 2000;31:1062-1068.

33. Carter AM, Catto AJ, Mansfield MW, et al. Predictive variables for mortality after acute ischemic stroke. Stroke 2007;38:1873-1880.

34. Huybrechts KF, Caro JJ. The Barthel Index and modified Rankin Scale as prognostic tools for long-term outcomes after stroke: a qualitative review of the literature. Curr Med Res Opin 2007;23:1627-1636.

35. deHaan R, Limburg M, Bossuyt P, et al. The clinical meaning of Rankin 'handicap' grades after stroke. Stroke 1995;26:2027-2030.

36. Dromerick AW, Edwards DF, Diringer MN. Sensitivity to changes in disability after stroke: A comparison of four scales useful in clinical trials. J Rehabil Res Dev 2003;40:1-8.

37. Barak S, Duncan PW. Issues in selecting outcome measures to assess functional recovery after stroke. NeuroRx 2006;3:505-524.

38. Huybrechts KF, Caro JJ, Xenakis JJ, et al. The prognostic value of the modified Rankin Scale score for long-term survival after first-ever stroke. Cerebrovasc Dis 2008;26:381-387.

39. Suto Y, Kowa H, Nakayasu H, et al. Relationship between three-year survival and functional outcome at discharge from acute-care hospitals in each subtype of first-ever ischemic stroke patients. Intern Med 2011; 50:1377-1383.

40. Chiu HT, Wang YH, Jeng JS Chen BB, et al. Effect of functional status on survival in patients with stroke: Is independent ambulation a key determinant. Arch Phys Med Rehabil 2012;93:527-531.

41. Melkas S, Putaala J, Oksala NK, et al. Small-vessel disease relates to poor poststroke survival in a 12-year follow-up. Neurology 2011;76:734-739.

42. Turner-Stokes L, Dzingina M, Shavelle R, et al. Estimated life-time savings in the cost of ongoing care following specialist rehabilitation for severe traumatic brain injury in the United Kingdom. J Head Trauma Rehabil 2019;34: 205-214.

43. Finkelstein DM, Muzikansky A, Schoenfeld DA. Comparing survival of a sample to that of a standard population. J Natl Cancer Inst 2003;95:1434-1439.

44. Shavelle RM, Strauss DJ. Rating the raters: evaluating the predictions from a life expectancy rating service. J Insur Med 2009;41:178-190.

45. Gross CP, McAvay GJ, Krumholz HM, et al. The effect of age and chronic illness on life expectancy after a diagnosis of colorectal cancer: implications for screening. Ann Intern Med 2006;145:646-653.

46. Daskivich TJ, Lai J, Dick AW, et al. Urologic Diseases in America Project (2014). Variation in treatment associated with life expectancy in a population-based cohort of men with early-stage prostate cancer. Cancer, 120:3642-3650.

47. Tillquist MN, Maddox TM. Cardiac crossroads: deciding between mechanical or bioprosthetic heart valve replacement. Patient Prefer Adherence 2011;5:91-99.

16622606544 Deposited a new message:
"Hello there? Uh MS Spencer. My name is Matt Wilson. I'm an attorney from Tupelo Mississippi. I've been retained by ████████ And I'm trying to get um contact information or mailing address for brian spencer. Uh Because I'm trying to communicate and correspond with him Relating to some uh things that transpired recently in Tennessee. My number is area code 6622606544. Thank you. Bye. Bye."
Click here: 14699825011 to listen to full voice message.

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Mr. Spencer

Now that you have confirmed that you have received my letter, it will be easier for my process server to deliver our lawsuit to you.

I have no further need to speak with you, as your correspondence below has given me all the information I need to proceed.

In the meantime, I look forward to seeing you in court in Tennessee later this year.

Matt Wilson

Attorney at Law

Encompass Health Rehabilitation Hospital of Braintree
250 Pond Street
Braintree, MA 02184-

Patient: SPENCER, BRIAN

| | | | |
|---|---|---|---|
| MRN: | | Admit Date: | 5/1/2023 |
| FIN#: | | Discharge Date: | 5/5/2023 |
| DOB/Age/Gender: 10/31/1973 49 years | Male | Attending Phys: | Williams MD,Arthur P |

## DC Info/Summary

DOCUMENT NAME:                          Physician Discharge Summary
SERVICE DATE/TIME:                      5/5/2023 15:00 EDT
RESULT STATUS:                          Auth (Verified)
PERFORM INFORMATION:                    Williams MD,Arthur P (5/5/2023 15:03 EDT)
SIGN INFORMATION:                       Williams MD,Arthur P (5/5/2023 15:03 EDT)

### Discharge Summary Rehab

Patient:   SPENCER, BRIAN          MRN:              FIN:
Age:   49 years   Sex: Male     DOB:   10/31/1973
Associated Diagnoses:   None
Author:   Williams MD, Arthur P

Patient is a 49-year-old gentleman who presented to Good Samaritan Hospital on April 23 with
left-sided weakness.  Head CT showed right basal ganglia hemorrhage.  Patient was transferred to
Saint Elizabeth Hospital.  CAT scan and MRI showed stable hemorrhage with some edema but no mass
effect.  CTA showed no underlying vascular abnormality.  Patient did have high blood pressure
requiring nicardipine drip.  Blood pressures to be kept under 160.  Patient was placed on Keppra for
seizure prophylaxis from 1 week patient had improvement in his strength but does have some
clumsiness in hand.  He was transferred to Braintree rehab hospital for further care.  Patient will
have an angiogram on May 3

Hospital Course: Patient was admitted to Braintree rehabilitation Hospital Hunt did well in terms of
therapy
▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬.
Patient was seen for an angiogram at Saint Elizabeths Hospital during his hospitalization.
▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

Discharge Medications:

Home Medications (7) Active
acetaminophen 325 mg oral tablet 650 mg = 2 tab, PRN, Oral, q6hr
docusate sodium 100 mg oral capsule 100 mg = 1 cap, PRN, Oral, q12hr
lisinopril 10 mg oral tablet 10 mg = 1 tab, Oral, Daily
melatonin 3 mg oral tablet 3 mg = 1 tab, PRN, Oral, qPM
pantoprazole 40 mg oral delayed release tablet 40 mg = 1 tab, Oral, Before breakfast

Wellbutrin XL 150 mg/24 hours oral tablet, extended release 150 mg = 1 tab, Oral, Daily

Discharge diagnosis

Right basal ganglia hemorrhage
Left hemiparesis
Hypertension
▬▬▬▬

Case 1:23-cv-00002    Document 39    Filed 07/06/23    Page 18 of 22 PageID #: 268

# THE LAW OFFICE OF MATTHEW WILSON,

## Matthew Wilson, Attorney at Law
—Admitted in MS, TN, and before the USP TO—

2218-B West Main Street, Tupelo, MS 38801
PO Box 4814, Miss. State, MS 39762
www.betteraskmatt.com

Telephone: (662) 260-6544
Facsimile: (662) 546-4893
Email: _lawyermatt@betteraskmatt.com_

December 19, 2022

Brian Eugene Spencer
47 Dean Place
East Bridgewater, MA 02333

    RE:   Cease and Desist

Mr. Spencer:

    On or about December 1, 2022, you delivered multiple letters via U.S. Mail to family and friends of my client, ▇▇▇▇▇▇. These letters contain sexually explicit photographs of ▇▇▇▇▇ that you improperly obtained, presumably from your wife's phone. Packaged as Christmas cards from the ▇▇▇▇ family to their friends, these letters were maliciously designed to humiliate my client.

    We demand that you cease and desist from communicating with Mr. ▇▇▇▇ his wife, or any of his friends, family, or coworkers. Any subsequent communication directed toward ▇▇▇▇▇▇ – or to any person associated with him – will be met with the full force of Federal and/or State law.

    You have been put on notice. Govern yourself accordingly.

Matt Wilson
Matt Wilson
Attorney at Law

*5 ref. to Plaintiff's name Prior to Suit.*

## CERTIFICATION OF SERVICE

6/29/23

I, Brian Spencer certify that on this day, I have mailed by first class US mail, postage prepaid, a true and correct copy of the aforesaid Counter-Suit to the Counter-Defendants Attorney as I am restricted from contacting or having the Counter-Defendant Contacted on my behalf or mentioning the name of said Counter-Defendant by the court this is filed with. At the following address.

Attorney Matthew Wilson

2218 W.Main St. Suite B

Tupelo, MS 38801

RESPECTFULLY SUBMITTED, on this the 28th day of June 2023

Brian Spencer, Pro SE

Date: 6/29/23

9

Brian E. Spencer
47 Dean Pl.
E. Bridgewater MA 02333
1:23-cv-00002

Fred D. Thompson
U.S. Courthouse
719 Church St. Suite 1300
Nashville TN. 37203

